Filed 4/21/26  P. v. Barnes CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>PHILLIP LAFONDA BARNES,<br><br>    Defendant and Appellant. | F088759<br><br>(Super. Ct. No. BF199226A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Tiffany Organ-Bowles, Judge.

Matthew J. Watts, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ian P. Whitney and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Phillip Lafonda Barnes was convicted by a jury of felony fleeing and eluding law enforcement, driving under the influence of alcohol and drugs, and driving with a blood-alcohol content (BAC) over 0.08. He pleaded no contest to driving with a suspended license. He was sentenced to a term of four years in prison.

On appeal, Barnes challenges his conviction under Vehicle Code[1] section 2800.2. He argues there was insufficient evidence he drove with willful or wanton disregard for the safety of persons or property while fleeing pursuing police officers. Barnes further argues he was prejudiced by juror misconduct and removal of a juror. Finally, Barnes argues the trial court erred by giving the jury instruction under CALCRIM[2] No. 332 regarding expert witness testimony, because the opinions given by the prosecution's investigator were lay opinions.

We reject Barnes's contentions and affirm the judgment.

## PROCEDURAL BACKGROUND

On June 20, 2024, the Kern County District Attorney filed an information charging Barnes with felony fleeing and eluding law enforcement (§ 2800.2, count 1), misdemeanor driving under the influence of alcohol (§ 23152, subd. (a), count 2), misdemeanor driving with over 0.08 BAC (§ 23152, subd. (b), count 3), misdemeanor driving under the influence of a drug (§ 23152, subd. (f), count 4), misdemeanor driving under the combined influence of alcohol and a drug (§ 23152, subd. (g), count 5), and misdemeanor driving with a license suspended due to a previous driving under the influence conviction (§ 14601.2, subd. (a), count 6). As to count 1, the information alleged Barnes suffered three prior serious and/or violent felony convictions that also qualified as three prior strike convictions within the meaning of the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)). As to counts 2 through 5, the information alleged it was Barnes's third offense for driving under the influence within

---

[1]     All further statutory references are to the Vehicle Code.

[2]     Judicial Council of California Criminal Jury Instructions.

2.

10 years (§ 23546, subd. (a)). The information further alleged the following aggravating circumstances: Barnes engaged in violent conduct that indicates a serious danger to society (Cal. Rules of Court,[3] rule 4.421(b)(1)), Barnes's prior convictions are numerous or of increasing seriousness (rule 4.421(b)(2)), Barnes served a prior prison term (rule 4.421(b)(3)), Barnes was on probation at the time of the crime (rule 4.421(b)(4)), and Barnes's prior performance on probation was unsatisfactory (rule 4.421(b)(5)).

On September 3, 2024, Barnes entered a plea of no contest on count 6 misdemeanor driving on a suspended license (§ 14601.2, subd. (a)).

On September 5, 2024, the jury found Barnes guilty as charged on counts 1 through 5. On the same day, the trial court found Barnes's prior serious and/or violent felony convictions true.[4] The court also found true that Barnes's prior convictions were numerous or of increasing seriousness (rule 4.421(b)(2)), Barnes served a prior prison term (rule 4.421(b)(3)), and Barnes was on probation at the time of the crime (rule 4.421(b)(4)). The court did not find true that Barnes engaged in violent conduct that indicates a serious danger to society (rule 4.421(b)(1)) or Barnes's prior performance on probation was unsatisfactory (rule 4.421(b)(5)).

On October 3, 2024, the trial court sentenced Barnes to an aggregate term of four years in prison as follows: on count 1, four years (the middle term, doubled because of the strike prior); on count 2, 364 days, to run concurrent to the term on count 1; on count 6, 180 days, to run concurrent to the term on count 2; and on counts 3, 4, and 5, 364 days stayed pursuant to Penal Code section 654.[5]

---

[3] All further rule references are to the California Rules of Court.

[4] The parties agreed to bifurcate the prior conviction allegations and aggravating factors.

[5] At sentencing, the trial court granted Barnes's motion to strike his prior two strike convictions pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. The court imposed the remaining strike prior.

# FACTUAL BACKGROUND

## A. Prosecution's Case-in-chief

On March 8, 2024, at approximately 2:00 a.m., police officer J. Patty was dispatched to a gas station to conduct a welfare check on a man who was having a "medical issue" or unconscious in his vehicle.[6] When Patty arrived, he found Barnes asleep in a gold vehicle. Barnes appeared to be "unconscious" and "disorientated." Patty illuminated Barnes with his flashlight, identified himself as a police officer, and attempted to speak to Barnes. Barnes did not acknowledge Patty. Instead, Barnes began to "fumble for his keys" and backed out of the parking lot. Patty told him to stop; Barnes did not listen to his command.

Patty broadcasted over his radio that a man "having a medical emergency or under the influence" was fleeing the gas station. Patty returned to his marked patrol vehicle and began to follow Barnes's vehicle, which was traveling northbound down the street. Barnes was traveling at approximately 50 miles per hour down Oak Street, which has a speed limit of 40 miles per hour. Patty accelerated his patrol vehicle to about 60 miles per hour to "catch up" to Barnes's vehicle.

Other officers joined in the pursuit in marked patrol vehicles and activated their overhead lights. Barnes made an eastbound turn on Truxtun Avenue and failed to stop at a red light when he did so. Barnes continued traveling eastbound down the street while patrol vehicles pursued him. Barnes's vehicle thereafter temporarily pulled over like it was going to yield for the traffic stop but immediately accelerated and continued eastbound. Police officer P. Villalobos joined in pursuit of Barnes. He noted Barnes was traveling approximately 40 miles per hour while traveling eastbound on Truxtun Avenue, which has a speed limit of 35 miles per hour.

---

[6] Pursuant to rule 8.90, we refer to some persons by their initials. No disrespect is intended.

Thereafter, Barnes's vehicle made a southbound turn onto "A" Street. After Barnes made the turn, he ran a stop sign. Barnes then struck a hospital pole, drove over a shrubbery, and ran into a tree, where he eventually stopped. Barnes partially knocked down the hospital pole and tore up the shrubbery. Barnes's vehicle was damaged from striking the tree. Patty ordered Barnes out of his vehicle. After Barnes exited the vehicle and was handcuffed, he fainted. Patty requested medical aid.

Police officer J. Davis responded to the scene of the crash around 3:30 a.m. to conduct a driving under the influence investigation. Davis was unable to conduct field sobriety tests because Barnes was unresponsive and could not walk on his own.

Barnes was transported to the hospital. Two vials of blood were drawn by a registered nurse at approximately 3:40 a.m. Barnes's blood was later analyzed. His blood measured a BAC of 0.111 percent. Marijuana and phencyclidine (PCP) were also detected in Barnes's blood.[7]

District attorney investigator M. Iturriria provided expert witness testimony. Iturriria previously served as a highway patrol officer, received specialized training in driving under the influence cases, is a certified drug recognition expert and drug recognition expert instructor.

Iturriria described alcohol as a "central nervous system depressant." Alcohol affects an individual's ability to drive safely because it depresses the nervous system, and impairs coordination, judgment, and cognition. Marijuana also affects the central nervous system. Marijuana is a stimulant that impairs cognition, vision, ability to divide attention, and depth perception. The combined result of marijuana and alcohol range from poor coordination, unsteady gait, divided attention, impaired cognition and judgment, extremely high heart rate, very high blood pressure, paranoia, and psychosis.

---

[7]     PCP was detected in Barnes's blood in the amount of 2.5 nanograms per milliliter. Tetrahydrocannabinol (THC) was also detected in the amount of 2.0 nanograms per milliliter, OH-THC in the amount of 1.6 nanograms per milliliter, and THCA in the amount of 14.6 nanograms per milliliter.

PCP is "extremely potent" and "very impairing." PCP significantly affects an individual's coordination, cognition, their ability to take in information, and respond appropriately.

Iturriria viewed videos of the encounter between law enforcement and Barnes that occurred immediately after the crash. Iturriria opined Barnes appeared to be under the influence of PCP, noting Barnes had rigid muscle tone, a low, raspy, and mumbled speech pattern, and was sweating. When asked a hypothetical question based on the amount of alcohol, THC, and PCP found in Barnes's blood after the crash, Iturriria opined he was "one hundred percent certain" that an individual under the influence of alcohol, THC, and PCP would not be able to safely operate a vehicle. Barnes's driving pattern, speed, red light and stop sign violations, and subsequent crash is consistent with someone too impaired to operate a motor vehicle safely. Barnes's unconsciousness and collapse after being arrested is consistent with alcohol and drug impairment and not a seizure, although a seizure was possible.

## B. Barnes's Case-in-chief

Barnes testified on his own behalf. In the early morning hours of March 8, 2024, Barnes was in his vehicle waiting for his girlfriend at a gas station. Barnes had driven from Los Angeles to the gas station the night before to visit his girlfriend, who worked there. Barnes called his girlfriend when he arrived at approximately 11:00 p.m., but she was still working. He had a headache and felt nauseous from the drive, so he fell asleep in his vehicle.

Barnes was prone to seizures since being shot in 2022. He had his first seizure about nine months after the shooting incident. Barnes had a seizure on the night of the crash, but acknowledged the seizure was different than seizures he had prior to that. The seizures he had in the past involved shaking and loss of consciousness. The seizure he had on the night of the crash did not involve shaking.

6.

Barnes acknowledged he saw law enforcement's patrol vehicle's lights and sirens on the morning of March 8, 2024.  However, his seizure started when he initially began to pull over for law enforcement.  He did not remember anything that occurred after he first attempted to pull over for law enforcement except crashing into a tree.  Barnes's seizure stopped when the airbag deployed.  He did not remember anything after the crash.  He lost consciousness when he was being arrested by law enforcement.

Barnes did not use marijuana, PCP, or drink alcohol on the night of the crash.  He did not know how his BAC was 0.111 percent.  He only used marijuana occasionally prior to the incident, he is not "a big marijuana smoker."

Barnes did not intentionally try to evade the police because he did not know police vehicles were behind him.  Barnes thought the person knocking on his window when he was asleep in his vehicle at the gas station was a security guard who wanted him to move.  At the time of the crash, Barnes admitted his driving privileges were suspended.  He also admitted he suffered a prior felony conviction.

Approximately five months after the crash on August 22, 2024, investigator B. Ramirez photographed the scene of the crash.  When Ramirez took photos of the scene, the tree was not damaged.  The hospital pole was leaning over.  The shrubbery was damaged.

## C. **Rebuttal**

Iturriria opined that Barnes's blood contained "carboxylated THC" which stays in the blood if the individual chronically uses marijuana.  Barnes's blood results indicated he was a regular marijuana user.

Iturriria is a licensed paramedic and has experience treating individuals with seizures.  Typically, when an individual experiences a seizure, there is a shaking motion coupled with a loss of consciousness.  The shaking is involuntary.  Based on the video evidence, it did not appear Barnes experienced a seizure on the night of the crash because there was no shaking.  Barnes appeared to be on a "mixture of drugs and alcohol."

## DISCUSSION

### I. Substantial Evidence Supports the Conviction for Reckless Evasion

Barnes argues the evidence does not support a finding that he committed three or more separate point violations or caused property damage to establish that he drove recklessly, with willful or wanton disregard for the safety of persons or property in violation of section 2800.2, subdivision (b). The People argue substantial evidence supports Barnes's conviction for fleeing and eluding law enforcement. We agree with the People.

### A. Additional Background

The jury was instructed that to find Barnes guilty of violating section 2800.2, it had to find that he "drove [the vehicle] with willful or wanton disregard for the safety of persons or property." (CALCRIM No. 2181.) The court also read an instruction for section 2800.1 as a lesser-included offense, which omitted the "willful and wanton disregard" element. (CALCRIM No. 2182.) The record amply supports the jury's decision to find a violation of the former section.

### B. Applicable Law

When a defendant contends "there is insufficient evidence to support the judgment, our review is circumscribed. [Citation.] We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) The jury must be convinced of the defendant's guilt beyond a reasonable doubt, not the reviewing court. (*People v. Bean* (1988) 46 Cal.3d 919, 933.) " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Ibid*.) Logical inferences that may be drawn from circumstantial

evidence may be sufficient to prove the defendant committed the crime beyond a reasonable doubt. (*People v. Flores* (2020) 9 Cal.5th 371, 411.) " ' "A reversal for insufficient evidence is 'unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." ' " (*People v. Chubbuck* (2019) 43 Cal.App.5th 1, 9.)

A person commits felony evading under section 2800.2 when the person flees or attempts to evade a pursuing peace officer in violation of section 2800.1 and drives with "willful or wanton disregard for the safety of persons or property …." (§ 2800.2, subd. (a).) A violation of section 2800.1 occurs when, among other things, the police officer's vehicle has "at least one lighted red lamp visible from the front" that the defendant sees or reasonably should have seen, and the vehicle siren is on as "reasonably necessary." (§ 2800.1, subds. (a)(1) & (2).) Without the "willful or wanton disregard" element, a person evading an officer is only guilty of a misdemeanor. (§ 2800.1, subd. (a).)

One way the prosecution can prove willful or wanton disregard for safety is to show the defendant made at least three traffic violations or damaged property. (§ 2800.2, subd. (b).) However, the statute specifies evidence of willful or wanton disregard for safety "is not limited to" those examples. (*Ibid.*) Willful or wanton disregard for safety can be proven by showing the defendant drove with the mental state required for reckless driving. (*People v. Taylor* (2018) 19 Cal.App.5th 1195, 1203.) "Wantonness" in the context of section 2800.2 includes " ' " 'consciousness of one's conduct, intent to do or omit the act in question, realization of the probable injury to another, and reckless disregard of consequences.' " ' " (*People v. Weddington* (2016) 246 Cal.App.4th 468, 486.)

## C. Analysis

Barnes argues that there was insufficient evidence to support his conviction for felony evading a pursuing officer in violation of section 2800.2. He contends the

9.

evidence was inconclusive to show he was speeding because the testimony from law enforcement officers was based on a visual estimate made at night. Barnes points to facts that arguably undermined the accuracy of the officers' speed estimates. He argues that without speeding, the evidence supported only two point violations (failing to stop at a stop sign and a red light).

The testimony of pursuing officers belies Barnes's argument. After Barnes left the gas station, Patty followed him. Barnes was traveling at approximately 50 miles per hour down Oak Street, which has a speed limit of 40 miles per hour. Patty had to accelerate his vehicle to about 60 miles per hour to "catch up" to Barnes. Villalobos also pursued Barnes. Barnes made a turn on Truxtun Avenue from Oak Street and failed to stop at a red light. Barnes was then traveling approximately 40 miles per hour on Truxtun Avenue, which has a speed limit of 35 miles per hour.

" 'To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People v. Thornton* (1974) 11 Cal.3d 738, 754, disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12.) The officers' testimony that Barnes was speeding is "evidence that is reasonable, credible, and of solid value" from which the jury could conclude Barnes exceeded speeds over the posted limit. (*In re Jerry M.*, *supra*, 59 Cal.App.4th at p. 298.)

Nevertheless, substantial evidence supports additional point violations other than Barnes's speed. One of the traffic violations included in section 2800.2, subdivision (b) is driving under the influence of alcohol. The jury found Barnes guilty beyond a reasonable doubt of this charged offense, which carries a value of two points. (§ 12810,

subd. (b) ["[a] conviction of a violation of Section 23152 … shall be given a value of two points"].) He also admitted to driving on a suspended license. A violation for driving on a suspended license also carries a value of two points. (§§ 12810, subd. (e), 14601.2, subd. (a).) Barnes does not argue the evidence does not support the verdict on counts 2 and 6. Thus, substantial evidence supports the jury's conclusion Barnes satisfied the statutory criteria. (See *People v. Mutuma* (2006) 144 Cal.App.4th 635, 641; *People v. Laughlin* (2006) 137 Cal.App.4th 1020, 1026–1028 [any traffic violations amounting to three points may prove the element of willful or wanton disregard for the safety of persons or property as a matter of law].) We conclude that substantial evidence supports the finding that Barnes suffered three or more point violations to warrant his felony evading conviction.

Alternatively, Barnes argues the element of property damage is inconclusive because the prosecution relied on damage to Barnes's own vehicle. He further argues that while there was damage to shrubbery and the hospital pole, there was no evidence the pole and shrubs were in a different state prior to the incident.

We note that property damage is an alternative ground for finding willful or wanton disregard for safety under section 2800.2. (*People v. Pinkston*, *supra*, 112 Cal.App.4th at p. 394.) Even so, the fact that there is no evidence to show what the hospital pole or shrubbery looked like *before* the crash did not preclude a finding of wanton disregard for safety. Barnes damaged property while fleeing from police officers—who pursued him with their lights and sirens activated—when he drove over shrubbery, hit a hospital pole, and crashed into a tree. Jurors were shown photographs and video evidence, depicting the hospital pole was "partially knocked down" and the shrubbery was damaged. No evidence suggested this property damage was caused by anything other than Barnes's crash.[8]

---

[8] We need not weigh in on the issue of whether damage to Barnes's own vehicle may account for the property damage under section 2800.2, subdivision (b), because even

Further, section 2800.2 does not limit the evidence to traffic violations or property damage. (§ 2800.2, subd. (b).) Evidence of willful or wanton disregard for safety may also include driving with the mental state required for reckless driving. (*People v. Taylor*, *supra*, 19 Cal.App.5th at p. 1203.) Ample evidence showed Barnes was aware his actions presented a substantial and unjustifiable risk of harm, and he intentionally ignored that risk. (§ 2800.2; CALCRIM No. 2181.) After the officers turned on their red lights and sirens to initiate a traffic stop, Barnes accelerated over the posted speed limit. He failed to stop at a red light and continued speeding down the street while patrol vehicles pursued him. Barnes then ran a stop sign, struck a hospital pole, drove over shrubbery, and ran into a tree.

From these facts, the jury reasonably could infer Barnes fled pursuing officers with willful or wanton disregard for the safety of persons or property. Substantial evidence supports the jury's conclusion.

## II.     Claim of Juror Misconduct

Barnes contends Juror No. 9 committed prejudicial misconduct by introducing extrinsic evidence into deliberations, which violated his constitutional right to confrontation, a fair trial, and an impartial jury. Because the extrinsic evidence was communicated to the entire jury, he contends the trial court erred when it declined to grant Barnes's motion for mistrial instead of simply removing the juror. He contends this raised a presumption of prejudice that cannot be rebutted.

The People respond Barnes forfeited the issue for failure to object on the grounds now asserted. Reaching the merits, the People counter any presumption of prejudice is rebutted because the record demonstrates no bias and no substantial likelihood of harm.

We conclude the juror committed misconduct, but the presumption of prejudice was rebutted because the juror was discharged, the remaining jurors had the ability to

---

if we were to accept Barnes's argument that damage to his own vehicle could not be considered, there was sufficient other evidence of property damage to satisfy the statute.

12.

remain fair and impartial, and the information provided to the sitting jurors was inherently nonprejudicial in light of the overwhelming evidence of Barnes's guilt.

## A. Additional Background

During jury deliberations, the trial court received a note from the jury foreperson that stated Juror No. 9 "Googled the pole in the hospital parking lot." The court indicated it would need to inquire whether the other jurors could remain fair and unbiased. The court stated, "I want to find out the extent to which information was relayed to the remaining jurors. [¶] At this point I do[ not] think we have any choice but to remove the person who allegedly Googled [the pole] unless I have [the jurors] say, no, I do[ not] know what you[ are] talking about." Defense counsel objected to removing the juror.

The trial court spoke to the jury foreperson alone. The foreperson stated Juror No. 9 told the jury during deliberations he had "Googled the pole in the hospital parking lot" and the pole looked like it had been bent for 10 years. Nothing was shown to the jury. Despite receiving this information, the foreperson told the court he could be fair and unbiased and could set aside the information, recognizing it was not in evidence.

The trial court questioned the remaining jurors. All the other jurors were present when Juror No. 9 made the statement. The other jurors told the court they could remain fair and unbiased and could set aside the information. The court instructed the jurors not to speak to each other regarding the topic.

The trial court found juror misconduct occurred on behalf of Juror No. 9. The court discussed how Juror No. 9 violated multiple jury instructions. The court concluded:

> "[I]t is abundantly clear to the Court that Juror [No. 9] participated in juror misconduct. I do not believe it was severe enough to taint the entire jury. However, the fact that the juror was bold enough to not only do the Google search but then also share that with his fellow jurors … indicates to the Court that he has participated in juror misconduct and must be removed [from] the jury."

Defense counsel objected to the removal of the juror. He argued there was no prejudice because the remaining jurors told the trial court they could remain fair and

13.

impartial despite receiving the information. Defense counsel pointed out the California Supreme Court criticized removal of a juror for failure to deliberate. Defense counsel further argued the juror may have been a "minority juror."

The trial court noted five separate instructions which informed the jurors not to participate in outside research and only contemplate evidence presented during trial. The court removed the juror for failing to abide by jury instructions and the law.[9] The court found defense counsel's argument to be unpersuasive because he focused on removal of a juror for refusal to deliberate and in this case, the juror "blatantly" failed to follow "multiple jury instructions." The court also found Juror No. 9 to likely be in the majority since the statement was made right before deliberations had concluded; the court assumed a unanimous decision had been made before the other jurors received the information.

Juror No. 9 admitted to sharing the information from the Internet with the other jurors. The trial court removed him as a juror. The court brought in an alternate juror. The jury resumed deliberations the next day.

Defense counsel moved for a mistrial on the grounds previously argued. Specifically, defense counsel argued removal of Juror No. 9 violated Barnes's right to a jury trial and right to due process.

The trial court denied Barnes's motion for mistrial. While Juror No. 9 committed misconduct by violating "multiple jury instructions," the court found no prejudice based on any information the jury received from Juror No. 9 during deliberations.

## B. Barnes's Claim of Error Is Forfeited

To preserve a claim of error resulting from juror misconduct, the defendant must raise the issue below and seek relief on the same grounds. (*People v. Dykes* (2009) 46

---

[9] The jury instructions the trial court found Juror No. 9 violated are as follows: CALCRIM No. 101 [Cautionary Admonitions: Jury Conduct (Before, During, or After Jury Is Selected)], CALCRIM No. 124 [Separation Admonition], CALCRIM No. 200 [Duties of Judge and Jury], CALCRIM No. 201 [Do Not Investigate], and CALCRIM No. 3550 [Pre-Deliberation Instructions].

14.

Cal.4th 731, 808, fn. 22.) Where the defendant raised some juror misconduct claims in his motion for a new trial below, that does not preserve the other bases he now claims on appeal. (See *People v. Masotti* (2008) 163 Cal.App.4th 504, 508 ["[a] motion for new trial may be granted only upon a ground raised in the motion"]; see also *People v. Holloway* (2004) 33 Cal.4th 96, 124 [failure to seek the juror's excusal results in forfeiture of the issue on appeal].)

Defense counsel expressed dissatisfaction with the trial court's removal of Juror No. 9 and moved for a mistrial on that basis. Defense counsel argued there was no prejudice in keeping the juror because the remaining jurors told the trial court they could remain fair and impartial despite receiving the information. Counsel argued, in fact, it would be prejudicial to remove the juror.

For the first time on appeal, Barnes now argues the court erred in not recusing the entire jury because they received extrinsic information from Juror No. 9's misconduct. Having expressed no desire to have the juror discharged, and no concern the entire jury was tainted by receipt of the juror's information, defendant " 'is not privileged to make that argument now for the first time on appeal.' " (*People v. Holloway*, *supra*, 33 Cal.4th at p. 124.)

We nonetheless exercise our discretion to reach the merits of Barnes's forfeited claim. (*In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7.)

C. **Analysis**

A criminal defendant has a right to a trial by unbiased, impartial jurors that is guaranteed by both the federal and state Constitutions. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; see *In re Hitchings* (1993) 6 Cal.4th 97, 110.) "A deprivation of that right can occur even if only one juror is biased." (*People v. Brooks* (2017) 3 Cal.5th 1, 98 (*Brooks*).)

Juror misconduct generally raises a rebuttable presumption of prejudice to the defendant and juror bias. (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (*Nesler*).)

One type of juror misconduct occurs when a juror receives information about the case that was not part of the evidence received at trial. (*Ibid*.) Juror misconduct may also occur when jurors talk among themselves or with anyone else on any subject connected with the trial. (Pen. Code, § 1122, subd. (a)(1); see *People v. Jackson* (2016) 1 Cal.5th 269, 332 (*Jackson*).) "[E]ven inadvertent exposure to out-of-court information may constitute misconduct giving rise to the presumption of prejudice." (*Brooks*, *supra*, 3 Cal.5th at p. 98.)

"When a court becomes aware of possible juror misconduct, it must ' " ' "make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged. ' " ' [Citation.] The nature of the court's inquiry may consist of a full hearing or informal questioning of the juror in the presence of counsel. [Citation.] 'The specific procedures to follow in investigating an allegation of juror misconduct are generally a matter for the trial court's discretion.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1170; see also Pen. Code, § 1089 [trial court may discharge juror for good cause if juror unable to perform duty].)

Juror bias "may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not 'inherently' prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was 'actually biased' against the defendant." (*Nesler*, *supra*, 16 Cal.4th at pp. 578–579.) "The surrounding circumstances include 'the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant.' [Citation.] '[W]e accept the trial court's findings of historical fact if supported by substantial evidence, but we review independently the question of whether prejudice arose from juror misconduct.' " (*Jackson*, *supra*, 1 Cal.5th at p. 332.)

A reviewing court considers the effect of a juror's receipt of out-of-court information by review of the entire record. (*In re Carpenter* (1995) 9 Cal.4th 634, 653 (*Carpenter*).) The presumption of prejudice is rebutted, and the verdict will not be set aside if the reviewing court determines, after considering the entire record, the nature of the juror's conduct, and the surrounding circumstances, that there was not a " 'substantial likelihood' " of juror bias against the defendant. (*Brooks*, *supra*, 3 Cal.5th at pp. 98–99; see also *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 612–613.)

The People implicitly concede, and we agree, Juror No. 9 committed misconduct by using the Internet to research the pole before the collision and by sharing this information with other jurors. The remaining jurors received out-of-court information giving rise to a presumption of prejudice. (*Nesler*, *supra*, 16 Cal.4th at p. 579; see also *People v. Ramos* (2004) 34 Cal.4th 494, 519 ["[j]uror misconduct involving the receipt of extraneous information about a party or the case that was not part of the evidence received at trial creates a presumption that the defendant was prejudiced by the evidence and may establish juror bias"].)

Applying our independent review regarding the question of prejudice but giving deference to the trial court's credibility determinations and factual findings, we conclude the presumption of prejudice is rebutted, and there is no substantial likelihood of bias to Barnes because the offending juror was replaced with an alternate, and the remaining jurors expressed their ability to be fair and impartial, and set aside the extrajudicial information they received from Juror No. 9. (*Carpenter*, *supra*, 9 Cal.4th at p. 659.)

The evidence presented in the trial court established that at the close of the jury's deliberations, Juror No. 9 informed the other jurors he conducted an Internet search of the pole that showed it was bent prior to the collision. The statement was made verbally at the end of jury deliberations after the other jurors had "pretty much came to a conclusion." Juror No. 9 did not show the other jurors the results of the search. The jury foreperson immediately reported the misconduct to the court prior to returning verdicts.

17.

The court therefore quickly learned of Juror No. 9's independent search and was able to question the other jurors and evaluate what occurred while their memories were fresh.

The trial court questioned each juror individually whether receipt of the improper information about the pole would affect their ability to be fair and impartial. We also consider the affirming statements and conduct of the remaining jurors, which demonstrates they had the ability to remain fair and impartial, and were able to disregard the out-of-court information to which they were exposed. We also find significant that defense counsel fought to keep Juror No. 9 and conceded there was no prejudice to the jury. The record discloses no evidence to the contrary. (See *People v. Zapien* (1993) 4 Cal.4th 929, 994–997 [the court may remedy juror misconduct by questioning the jurors involved and obtaining assurances that they are able to disregard the improper information and decide the case solely on the evidence and the jury instructions previously given].) The trial court's conclusion that the other jurors could remain impartial and set aside the information was sound; the trial court is in the best position to observe the jurors' demeanor and determine whether they were biased. (*Jackson*, *supra*, 1 Cal.5th at p. 334.)

Moreover, the trial court admonished the jurors before the presentation of evidence, before deliberations, and again after the removal of Juror No. 9, to not research or discuss the case and to keep an open mind. These admonitions were sufficient, and any presumption of prejudice was rebutted because the court instructed the jurors to set aside the information from Juror No. 9 and only consider the evidence presented at trial, and the jurors indicated they had the ability to do so. (See *People v. Harris* (2013) 57 Cal.4th 804, 857 [presumption of prejudice adequately rebutted where trial court instructed the jurors that they could not draw inferences based on what another juror may have observed, and no juror indicated the incident would impair his or her ability to be fair and impartial]; see also *People v. Fayed* (2020) 9 Cal.5th 147, 175 [the presumption of prejudice was rebutted in part by affirmations from the remaining jurors who replied

18.

they were able to fulfill their duties as jurors and agreed not to form or express any opinion about the case until the matter was submitted].)

Barnes cites *People v. Holloway* (1990) 50 Cal.3d 1098, 1110 (*Holloway*)[10] to support his position that prejudice occurs when a juror is exposed to information other than the evidence produced at trial. There, defendant's prior criminal history was ruled inadmissible before trial. (*Id*. at p. 1106; Evid. Code, §§ 352, 1101.) During trial, the court admonished jurors to refrain from reading newspaper articles or listening to other media reports about the case. (*Ibid*.) However, it was discovered shortly after the jury returned verdicts in the guilt phase that one of the jurors read a newspaper article on the second day of trial stating that the defendant was on parole from prison after having served a prison sentence for assault. (*Ibid*.) Upon learning of this information, defense counsel brought a motion for mistrial. (*Id*. at p. 1107.) The court denied the motion and ruled the juror did not commit misconduct. (*Id*. at pp. 1107–1108.)

Our Supreme Court reversed the judgment finding the juror committed misconduct. (*Holloway*, *supra*, 50 Cal.3d at p. 1112.) In so holding, the court reasoned that the "article was extremely prejudicial; it revealed information about [the] defendant's prior criminal conduct that the court had ruled inadmissible because of its potential for prejudice. The court and counsel had gone to great lengths to avoid having the jury learn of [the] defendant's prior conviction for having assaulted a woman with a hammer. Their efforts were to no avail as to one juror—a fact that they did not learn until after it was too late to take any curative steps." (*Id*. at p. 1110.)

*Holloway* is distinguishable because the extrinsic information in that case, evidence of the defendant's other crimes, was particularly prejudicial and was revealed after the jury returned guilty verdicts. (*Holloway*, *supra*, 50 Cal.3d at p. 1110.) The *Holloway* court noted that the ruling may have been different had the juror obtained less

---

[10]    Disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.

prejudicial information or revealed it in time for the court to have taken corrective steps to cure the misconduct through admonition or other measures. (*Id*. at pp. 1111–1112.) In this case, both occurred.

The content of the information was not inherently prejudicial. In fact, evidence of prior damage to the pole may have been helpful to Barnes in showing lack of property damage under section 2800.2. Significantly, however, the trial court took corrective steps to cure the misconduct through admonition and dismissal of the offending juror prior to the jury rendering a decision. This was not a situation where jurors knew of extrinsic information throughout the entire proceedings and no curative measures were taken until after the jury returned the verdict. (*Holloway*, *supra*, 50 Cal.3d at pp. 1106, 1111–1112.) Nothing about the remaining jurors' conduct showed they "failed to base [their] verdict solely on the evidence." (*Carpenter*, *supra*, 9 Cal.4th at p. 656.)

Our examination of the entire record shows there is no reasonable probability of actual harm to Barnes, because the offending juror was removed and replaced by an alternate, and the remaining jurors assured the trial court they could set aside the information and remain fair and impartial. The record does not reflect a substantial likelihood the remaining jurors were influenced by bias against Barnes; the remaining jurors' ability to serve impartially appears as a demonstrable reality in the record.

Thus, the presumption of prejudice was rebutted, by timely removal of the offending juror and admonishing the remaining jurors. The trial court did not err by refusing to declare a mistrial or by failing to excuse the entire jury. (See, e.g., *In re Hitchings*, *supra*, 6 Cal.4th at p. 119 [the "presumption of prejudice ' "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party" ' "].) We have no basis to conclude Barnes was denied his Sixth Amendment right to an impartial jury.

## III. The Trial Court Did Not Abuse Its Discretion by Discharging Juror No. 9

Barnes next contends the trial court failed to understand it had discretion when it discharged Juror No. 9 and alternatively, erred because the juror did not commit misconduct that was a "demonstrable reality." Barnes contends these errors require reversal of the judgment.

The People respond the court understood its discretion and properly exercised it by discharging Juror No. 9 and replacing him with an alternate. We agree with the People.

### A. Legal Principles Governing Discharge of a Sitting Juror

As we previously stated, the trial court may discharge a juror for good cause at any time if the trial court finds the juror is "unable to perform his or her duty." (Pen. Code, § 1089; *People v. Boyette* (2002) 29 Cal.4th 381, 462.) "When juror misconduct is discovered before a verdict is reached, the trial court has a choice among several remedies, one of which is to discharge the offending juror and replace the juror with an alternate." (*Rufo v. Simpson*, *supra*, 86 Cal.App.4th at p. 613.) "Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists." (*People v. Keenan* (1988) 46 Cal.3d 478, 532.)

We review a trial court's "ultimate decision whether to discharge a given juror" for an abuse of discretion. (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.) A court's decision regarding discharge is generally upheld if there is substantial evidence to support it; the record must show the juror's inability to perform as a " ' " 'demonstrable reality.' " ' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1242; see also *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 (*Barnwell*) [the more stringent demonstrable reality standard is to be applied in review of juror removal cases, which reflects the reviewing court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury].)

We afford deference to the trial court's credibility findings if supported by substantial evidence in assessing whether the court's ruling regarding juror discharge is supported by the record. (*Nesler*, *supra*, 16 Cal.4th at p. 582.)

## B. The Trial Court Exercised Its Discretion

We first consider whether the trial court abused its discretion by failing to exercise it. Barnes argues the trial court did not understand it had discretion to discharge the juror because it made comments indicating it had "no choice" but to discharge Juror No. 9.

Barnes's contention fails on this record. Although the trial court stated it had "no choice" but to dismiss the offending juror, in the context of the whole record, the court's comments showed it considered the evidence, surrounding circumstances, and exercised its informed discretion when it discharged Juror No. 9. (See *People v. Preyer* (1985) 164 Cal.App.3d 568, 573.) The court investigated the misconduct after the foreperson informed the court that Juror No. 9 performed an Internet search of the pole. The court brought in each juror and questioned them individually. The court also questioned the offending juror, who readily admitted to committing misconduct. The court considered this evidence, along with arguments from the prosecutor and defense counsel when it decided to discharge Juror No. 9.[11] (C.f. *People v. McNeal* (1979) 90 Cal.App.3d 830, 835–840 [after jury foreman reported that a sitting juror made statements showing she had personal knowledge of controverted facts at trial which went against jury instructions, the trial court's failure to make an appropriate inquiry into the facts to determine whether they constituted good cause for discharge of the juror constituted reversible error].)

The record also shows the trial court was aware of the applicable law regarding juror misconduct. The court noted that outside computer searches during deliberations is

---

[11]    The prosecutor pointed out the trial court retained "discretion" regarding removal of Juror No. 9. The court heard the parties' arguments prior to making a ruling. Thus, there is direct evidence the court understood it had discretion.

22.

a form of juror misconduct (see *People v. Brasure* (2008) 42 Cal.4th 1037, 1070) and significantly, the information was provided to the other members of the jury, which violated several jury instructions and the juror's oath. (See *People v. Keenan*, *supra*, 46 Cal.3d at p. 533 [the court also has the power to discharge a juror who refuses to adhere to their oath or take other steps when appropriate to deter any jury misconduct and ensure bias does not infiltrate trial proceedings].) The court considered how the judgment could be reversed on appeal if the court retained the offending juror.

The record shows the trial court exercised its informed discretion when it decided to discharge Juror No. 9.

## C. Discharge of Juror No. 9

Barnes next contends discharge of Juror No. 9 was erroneous and without good cause. We disagree.

The totality of the evidence itself supports the trial court's conclusion that Juror No. 9 could not be fair and impartial because he participated in an independent Internet search which allowed him to consider evidence not presented at trial, contrary to the court's instructions and violative of the juror's oath and the law. (See, e.g., *Smith v. Covell* (1980) 100 Cal.App.3d 947, 952 ["Jurors cannot, without violation of their oath, receive or communicate to fellow jurors information from sources outside the evidence in the case"]; *Carpenter*, *supra*, 9 Cal.4th at p. 647 ["[i]t is improper for a juror to receive information outside of court about the pending case"]; C.f. *People v. San Nicolas* (2004) 34 Cal.4th 614, 650–651 [no abuse of discretion for trial court's failure to discharge juror when the sole juror called to testify at the hearing regarding juror misconduct was ambiguous as to whether the juror consulted outside sources]; see also CALCRIM No. 101 [Cautionary Admonitions: Jury Conduct (Before, During, or After Jury Is Selected)], CALCRIM No. 124 [Separation Admonition], CALCRIM No. 200 [Duties of Judge and Jury], CALCRIM No. 201 [Do Not Investigate], and CALCRIM No. 3550 [Pre-Deliberation Instructions].)

23.

In the cases cited by Barnes, the offending juror committed slight, non-prejudicial misconduct. For example, in *People v. Compton* (1971) 6 Cal.3d 55, 59, a juror made an extrajudicial remark that the "the nature of the case" made it "difficult for him to keep an open mind." The trial court did not question the offending juror, "[r]ather, the court expressly found that [the juror's] remarks did not show he 'would be unable to serve ....' " (*Id*. at p. 60.) The court nevertheless discharged the juror merely " 'out of an abundance of caution and in fairness to the defendant.' " (*Ibid*.) The court declared a mistrial and discharged the entire jury. (*Id*. at pp. 60–61.) The Supreme Court held this was error because the court never investigated whether the offending juror could keep an open mind and "any risk of prejudice was so slight that it could surely have been negated by appropriate admonitions." (*Id*. at p. 61.)

Similarly, in *People v. Armstrong* (2016) 1 Cal.5th 432, 451, our high court found abuse of discretion in discharging a juror for refusal to deliberate. The evidence showed the jurors were in fact deliberating and at least two jurors informed the court the juror was deliberating. (*Id*. at p. 452.) Relying on this testimony, the court found that the juror "had deliberated" but also concluded that the juror was " 'not deliberating further' " and "reading her book and using her cell phone during deliberations [which] demonstrated her lack of participation." (*Ibid*.) In reviewing the whole record, the testimony showed some of the jurors were frustrated and disagreed with the offending juror's view of the prosecution's evidence. (*Id*. at p. 453.) The *Armstrong* court found " '[t]he court may not discharge a juror for failing to agree with the majority of other jurors or for persisting in expressing doubts about the sufficiency of the evidence in support of the majority view ....' " (*Id*. at pp. 453–454.)

Here, the offending juror expressly indicated he violated several jury instructions and the law by performing an outside search and disseminating the information to the remaining jurors. There was no conflicting testimony; all 11 jurors testified the same.

We are satisfied Juror No. 9's disqualifying bias was established to a "demonstrable reality." (*Barnwell*, *supra*, 41 Cal.4th at p. 1052.)

Barnes finally contends the trial court's inquiry into Juror No. 9's bias was inadequate. " '[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations.' " (*Barnwell*, *supra*, 41 Cal.4th at p. 1054.) The court's inquiry here was appropriately limited. The court examined Juror No. 9 as well as the other jurors. As it did so, it focused narrowly on the issue at hand. Once the court received uncontroverted testimony that Juror No. 9 violated jury instructions and the law, it discharged Juror No. 9 and replaced him with an alternate.

In sum, the trial court conducted an appropriate inquiry and gave detailed reasons for discharging Juror No. 9. The record reflects to a demonstrable reality that Juror No. 9 was unable to perform his duty as a juror because his independent Internet search of the pole, and dissemination of that information to his fellow jurors, was a blatant violation of several jury instructions and the law. (See, e.g., *People v. Boyette*, *supra*, 29 Cal.4th p. 462.) The court did not abuse its discretion when it discharged Juror No. 9.

## IV.  **Jury Instructions Regarding Expert Witness Testimony**

Barnes argues Iturriria was unqualified to render expert testimony and therefore the trial court erred in instructing the jury with CALCRIM No. 332, which addresses expert witness testimony. Barnes contends the issue is preserved on appeal despite his failure to object below because the error is of constitutional magnitude affecting his substantial rights, the issue presents a pure question of law, and any objection would have been futile. In the alternative, Barnes argues his counsel was ineffective for failure to object to the jury instruction.

The People respond Barnes forfeited his argument for failure to object to the expert qualifications and the jury instruction. Reaching the merits, the People maintain the expert testimony was admissible, the instruction was mandatory, and there was no error.

We conclude Iturriria was qualified to render expert testimony and there was no instructional error.

## A. Additional Background

At the outset of Iturriria's testimony, he described his training and experience. Iturriria previously served as a highway patrol officer for 21 years and received specialized training in driving under the influence cases. The initial training consisted of 52 hours of driving under the influence detection, investigation, and two alcohol correlation studies. Later, he took advanced drug training and learned the "seven major drug categories that cause impairment for purposes of driving."

After attending 105 hours of drug identification and classification training, Iturriria became a certified drug recognition expert. A drug recognition expert is trained in examining an individual and deciding what drug is causing impairment. The training is overseen by the National Highway Traffic Safety Administration. Iturriria also became a drug recognition expert instructor after 24 hours of additional training. He became the coordinator of the drug evaluation classification program at the Bakersfield California Highway Patrol (CHP) office.

While Iturriria was a highway patrol officer, he was personally involved in approximately 2,600 DUI investigations and testified as an expert in impairment more than 300 times. Before that, Iturriria was an emergency medical technician (EMT) for eight years and a licensed paramedic.

Iturriria received certification as an EMT, which included completion of a college course and "on-the-job training" from an ambulance company. He learned basic life support techniques, responses to medical emergencies, and treatment of individuals

suffering from medical emergencies as a result of drugs. Iturriria also received training to determine whether an individual is under the influence of alcohol and marijuana. He previously evaluated individuals under the influence of marijuana "hundreds of times." Defense counsel did not object to Iturriria's qualifications.

After describing this experience, and upon questioning by the prosecutor, Iturriria testified that, in his opinion, an individual's ability to safely operate a motor vehicle diminishes the more alcohol the individual consumes because it depresses the central nervous system. Iturriria described how an individual with a BAC of even 0.05 percent may show some indications of mental and physical impairment. Iturriria also discussed the different components of marijuana and how the components affect an individual. Iturriria opined marijuana, as well as the mixed effect of alcohol and marijuana, impairs an individual's ability to safely operate a motor vehicle. Iturriria also opined an individual would not be able to safely operate a motor vehicle while under the influence of PCP. Finally, Iturriria opined the mixed effect of alcohol, marijuana, and PCP would render an individual "completely impaired, unable to operate a motor vehicle."

The prosecutor turned to the video evidence on the night of the crash and specifically asked Iturriria what he noticed in the videos regarding Barnes's actions. Iturriria opined Barnes appeared to be under the influence of PCP by his actions in the video.

The prosecutor then posed a hypothetical to Iturriria, asking him whether an individual could safely operate a motor vehicle when the individual drives over the speed limit, runs both a stop sign and a red light, collides with a tree, and tests reveal a BAC of 0.11 percent, PCP of 2.5 nanograms per milliliter, 2 nanograms per milliliter of THC, 1.6 nanograms per milliliter of OH-THC, and 14.6 nanograms per milliliter of THCA. Iturriria considered those conditions and opined that the individual could not operate a motor vehicle safely. Defense counsel did not object to this questioning regarding Iturriria's opinions.

Defense counsel cross-examined Iturriria on his qualifications, highlighting that he does not have a college degree and never testified that a defendant was not impaired.

On rebuttal, Iturriria reiterated his experience providing emergency medical services and treating individuals with seizures. Iturriria opined that it did not appear Barnes experienced a seizure after watching the video evidence on the night of the crash. Defense counsel concluded his recross-examination of Iturriria but did not raise any further objection to the testimony nor move to strike the testimony.

Both the prosecutor and defense counsel referred to Iturriria as an expert, but the prosecutor did not move to qualify him as one.

The trial court stated it was including CALCRIM No. 332 in the jury instructions because there was "expert testimony." CALCRIM No. 332 regarding expert witness testimony was given as follows:

> "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion and the facts or information on which the expert relied in reaching that opinion. You must decide whether the information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable or unsupported by the evidence.

> "An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion."

There was no objection to the trial court's statement regarding expert testimony or providing CALCRIM No. 332.

## B. Barnes's Claim of Error Is Forfeited

The rule of forfeiture applies if the jury instruction is correct in law and responsive to the evidence unless the instruction affects the defendant's substantial rights. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012.) Defense counsel agreed with the instruction and did not request any modification or clarification. Barnes forfeited his claim of instructional error. (See *People v. Franco* (2009) 180 Cal.App.4th 713, 719.)

Likewise, Barnes forfeited his objection to Iturriria's expert qualifications. (*People v. Bolin* (1998) 18 Cal.4th 297, 321.) Barnes's trial counsel did not challenge Iturriria's expertise or make an objection on those grounds. While a testifying expert must be qualified by special knowledge, skill, and experience, the prosecution was not required to establish Iturriria's expert qualifications in the absence of an objection from the defense. (See Evid. Code, §§ 720, subd. (a), 802; see also *People v. Rodriquez* (1969) 274 Cal.App.2d 770, 776.) Failure to make a timely and specific objection to an expert witness's testimony will preclude a claim of error in the admission of the expert's opinion. (Evid. Code, § 353, subd. (a); see *People v. Farnam* (2002) 28 Cal.4th 107, 161–162 [the defendant forfeited his claim the expert was not qualified to testify about blood spatter evidence and crime scene reconstruction when he failed to challenge the opinion on these grounds].) By failing to object to Iturriria's testimony, Barnes did not allow the trial court to address any alleged error. In the absence of any such objection, Barnes forfeited his claims.

Acknowledging he failed to object, Barnes argues we should reach the merits because an objection would have been futile, the error presents a pure question of law, affected his substantive rights to due process and a fair trial, and his counsel was prejudicially ineffective because he failed to object to the jury instruction.

We first reject Barnes's claim that the issue presents a pure question of law. The issue Barnes raises necessarily requires reference to and consideration of the facts and circumstances of the case and the record. (See *People v. Bloyd* (1987) 43 Cal.3d 333, 357

29.

[whether a witness qualifies as an expert "depends upon the facts of the case and the witness's qualifications"]; see also *People v. Potts* (2019) 6 Cal.5th 1012, 1035–1036.)

We also reject Barnes's contention that an objection would have been futile. The trial court stated it was including CALCRIM No. 332 because there was "expert testimony." The parties did not discuss further the jury instruction. Thus, there is no basis for concluding the court would have still given the instruction if there was an objection.

However, the failure to object or otherwise preserve a claim of instructional error in the trial court does not preclude appellate review "for constitutional error." (*People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7; see also Pen. Code, § 1259; *People v. Franco*, *supra*, 180 Cal.App.4th at p. 719 [an examination of the merits of the claim is required to ascertain whether the alleged instructional error affected the substantial rights of the defendant, at least to the extent of determining whether the asserted error would result in prejudice if such error occurred].) Moreover, in the event of an ineffective assistance of counsel claim, the reviewing court must reach the merits to consider the prejudice suffered by the defendant. (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1325.)

Because Barnes argues the error affected his substantive rights, and also claims his counsel was ineffective for failure to object, we shall consider the merits of his contentions.

## C. Ineffective Assistance of Counsel

To prove ineffective assistance of counsel, a defendant must show his attorney performed below the standard of reasonableness under prevailing professional norms and that there is a reasonable probability the result would have been more favorable to him but for that substandard performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 686–688 (*Strickland*); *People v. Mayfield* (1993) 5 Cal.4th 142, 199.)

"Ineffective assistance of counsel claims are rarely cognizable on appeal," as we give deference to trial counsel's tactical choices, and the record rarely provides

30.

information regarding trial counsel's strategy. (*People v. Silvey* (1997) 58 Cal.App.4th 1320, 1329; *Strickland*, *supra*, 466 U.S. at pp. 690–691; *People v. Wilson* (1992) 3 Cal.4th 926, 936.) Where the record is silent as to counsel's reason, the court must reject an ineffective assistance of counsel claim "unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) An assertion that counsel was ineffective on a silent record is more appropriately made in a petition for habeas corpus, which promotes judicial economy.[12] (*People v. Dickey* (2005) 35 Cal.4th 884, 926; see *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

Barnes asserts Iturriria was not qualified to render expert opinion testimony and there could be no tactical reason for his counsel's failure to object to the jury instruction regarding expert witness testimony. The record is silent as to why defense counsel failed to object to CALCRIM No. 332.[13] However, defense counsel could have reasonably believed Iturriria was fully qualified to testify based on his background and experience. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463 ["Representation does not become deficient for failing to make meritless objections."].) Iturriria provided testimony beyond the common experience of the jury regarding issues of intoxication, seizures, and how drugs and alcohol affect the human body. Defense counsel may have also tactically failed to object because he did not want to draw attention to, or highlight, any of Iturriria's admissible expert testimony. Barnes fails to show how Iturriria was unqualified as an expert or that his counsel was ineffective for failure to object to the jury instruction on expert testimony.

---

[12]     A habeas corpus proceeding provides an evidentiary hearing and allows trial counsel the opportunity to set forth his or her reasons for acting or failing to act in the manner challenged. (Pen. Code, §§ 1483, 1484.)

[13]     Claims of ineffective assistance on a silent record are more appropriately made in a petition for habeas corpus. (See, e.g., *People v. Dickey*, *supra*, 35 Cal.4th at p. 926.)

31.

Barnes's claim on appeal that he was denied effective assistance of counsel fails to overcome the "strong presumption" that his trial counsel's conduct fell within the wide range of reasonable professional assistance. (*Strickland*, *supra*, 466 U.S. at p. 689.)

### 1. Expert Opinion Testimony Was Admissible

There is also no prejudice on this record. (*Strickland*, *supra*, 466 U.S. at p. 694.) Evidence Code section 720 provides that an expert may testify "if he has special knowledge, skill, experience, training, or education sufficient to qualify him," which "may be shown by any otherwise admissible evidence, including his own testimony." (*Id.*, subds. (a)–(b); *People v. Townsel* (2016) 63 Cal.4th 25, 45; see also *People v. Dowl* (2013) 57 Cal.4th 1079, 1088.) However, whether a person qualifies as an expert depends on the facts of the case and the witness's qualifications. (*People v. Bloyd*, *supra*, 43 Cal.3d at p. 357.) In this regard, "[t]he trial court is given considerable latitude in determining the qualifications of an expert." (*Ibid*.; see also *People v. Valdez* (1997) 58 Cal.App.4th 494, 507 [the admissibility of an expert's opinion depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved]; *People v. Morganti* (1996) 43 Cal.App.4th 643, 661 [trial court enjoys wide discretion when ruling on issues of relevance and expert qualifications].) "Error regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness ' " '*clearly lacks* qualification as an expert.' " ' " (*People v. Farnam*, *supra*, 28 Cal.4th at p. 162.)

" 'When a preliminary showing is made that the proposed witness has sufficient knowledge to qualify as an expert under the Evidence Code, questions about the depth or scope of his or her knowledge or experience go to the weight, not the admissibility, of the witness's testimony.' " (*Jackson*, *supra*, 1 Cal.5th at pp. 327–328.) An expert witness's opinion must relate to a subject that is beyond common experience and be based on matter perceived or personally known that reasonably may be relied upon to form an

expert opinion. (Evid. Code, § 801, subds. (a) & (b); see also *People v. Phillips* (2022) 75 Cal.App.5th 643, 682.)

The record establishes Iturriria was qualified to testify based on his background as an EMT, serving as a highway patrol officer for 21 years, specialization in driving under the influence cases and investigations, and certification as a drug recognition expert. He had also testified as an expert witness on numerous prior occasions. Utilizing his knowledge on the effect of drugs and alcohol on an individual's ability to drive, he was better able to describe to the jury the particulars of what occurred while Barnes fled from law enforcement and after he crashed his vehicle.

For example, he concluded from the video evidence on the night of the crash, that Barnes appeared to be under the influence of PCP. Given his expertise providing emergency medical services and treating individuals with seizures, he explained that it did not appear Barnes experienced a seizure. This evidence was relevant to the issue of Barnes's intoxication and his defense that he suffered a seizure during his flight from law enforcement.

Barnes criticizes Iturriria's lack of proper credentials. Citing several medical websites and literature, he argues Iturriria offered opinions outside his expertise. Barnes argues he was not permitted to testify on subjects including toxicology, pharmacology, and neurology and provided opinions which were "incorrect and scientifically unsound." He also argues Iturriria lacked a medical or college degree, and for those reasons, he was an unqualified expert.

Barnes's arguments are flawed. Often individuals of different nonphysician professions are called upon to provide opinions involving some medical expertise. (*People v. Rance* (1980) 106 Cal.App.3d 245, 255.) By virtue of Iturriria's experience and training, he was qualified to provide an opinion regarding the effect that alcohol, marijuana, and PCP have on an individual when operating a motor vehicle. Iturriria testified he was a drug recognition expert, was personally involved in 2,600 DUI

33.

investigations, and regularly responded to seizures. Iturriria had sufficient specialized training, in addition to the particular experience of having worked as a highway patrol officer and EMT to have reached an informed conclusion regarding Barnes's actions on the night of the crash. These topics were within his area of expertise. (See, e.g., *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 284 [no abuse of discretion in permitting retired police officer to testify as expert witness regarding the effect of drugs and impairment on an individual, where he had 25 years of experience and extensive training as a former police officer and handling DUI cases].)

Further, Iturriria's lack of proper credentials, knowledge, or expertise goes to the weight of the evidence, not admissibility. (*People v. Jones* (2012) 54 Cal.4th 1, 59 [once an expert witness establishes knowledge of a subject sufficient to permit his or her opinion to be considered by a jury, the question of the degree of the witness's knowledge goes to the weight of the evidence and not its admissibility]; *People v. Rance*, *supra*, 106 Cal.App.3d at p. 255.) Defense counsel was able to cross-examine Iturriria regarding his credentials, training, and expertise. The video evidence, photographs, and Barnes's blood test results were admitted into evidence which illustrated Iturriria's testimony. Any improper weight was counterbalanced.

There was no error in admitting Iturriria's expert witness testimony. (See, e.g., *People v. Jones* (2013) 57 Cal.4th 899, 946.)

## 2. No Instructional Error

We also find that providing CALCRIM No. 332 was proper. " '[T]he trial court must instruct on the general principles of law relevant to the issues raised by the evidence.' " (*People v. Najera* (2008) 43 Cal.4th 1132, 1136.) When a defendant raises a claim of instructional error, " 'we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights.' " (*People v. Smith* (2008) 168 Cal.App.4th 7, 13; *People v.*

*Rogers* (2006) 39 Cal.4th 826, 873.) "[I]n examining the entire charge we assume that jurors are ' " ' "intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " ' " (*Smith*, at p. 13.) "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.) Assertions based on purported instructional errors are reviewed de novo. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568; see also *People v. Sweeney* (2009) 175 Cal.App.4th 210, 223.)

Barnes argues the trial court erred when it provided CALCRIM No. 332 to the jury because it improperly elevated Iturriria's lay observations to expert status. He argues the instruction regarding lay opinion testimony should have been given.

Under Penal Code section 1127b, when the opinion of any expert witness is received in evidence, the trial court must provide the instruction regarding expert witness testimony sua sponte.[14] (*People v. Haynes* (1984) 160 Cal.App.3d 1122, 1136; Pen. Code, § 1127b.) Iturriria provided an opinion regarding impairment, seizures, and how drugs and alcohol affect the human body because of his knowledge, training, and experience which was beyond common experience. "Matters beyond common experience are not proper subjects of lay opinion testimony." (*People v. Williams* (1992)

_____

[14]     The language from section 1127b is substantially similar to CALCRIM No. 332. Section 1127b states as follows, " 'When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court *shall* instruct the jury substantially as follows: [¶] Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable. [¶] No further instruction on the subject of opinion evidence need be given.' " (*People v. Reeder* (1976) 65 Cal.App.3d 235, 241, italics added.)

3 Cal.App.4th 1326, 1333.) The trial court was required to give the instruction where, as here, the jury heard expert testimony. (*People v. Reeder*, *supra*, 65 Cal.App.3d at p. 241.)

CALCRIM No. 332 did not suggest to jurors Iturriria's testimony carried an undeserving weight. The instruction told the jurors that it was up to them to determine the meaning and importance of any expert testimony, just like they would with any other witness. The jury was told, "You must decide whether the information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable or unsupported by the evidence." The jury itself could make its own determination as to the weight it believed the expert testimony should be given. (See *People v. Leonard* (2014) 228 Cal.App.4th 465, 493–494 [finding any error in admitting expert testimony regarding type of pimp the defendant was harmless because CALCRIM No. 332 reminded the jury that they need not accept the expert's testimony as true or correct]; *Jackson*, *supra*, 1 Cal.5th at p. 328 [" '[w]hen a witness gives his personal opinion on the stand—even if he qualifies as an expert—the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible' "]; *People v. Prince* (2007) 40 Cal.4th 1179, 1223 [courts regularly permit a broad range of expert testimony in criminal cases, notwithstanding the jury's ability to examine other evidence to form their own "commonsense" conclusions].)

The jury was also provided with other instructions on how to evaluate Iturriria's testimony. CALCRIM No. 226 provided factors for the jury to consider in evaluating *any* witness's testimony. We presume the jury understood and followed the instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

However, even assuming instructional error occurred, it was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The evidence adduced at trial supporting guilt was strong. Law enforcement officers testified regarding Barnes's actions on the night of the incident. Barnes's BAC measured 0.111 percent. Marijuana and PCP were also detected in Barnes's blood. Video and photographic evidence depicted Barnes's initial encounter

with law enforcement, his flight, the collision, and its aftermath.  In view of the instructions given, and after review of the record as a whole, Barnes cannot demonstrate prejudicial error from the jury instruction on expert witness testimony and even if it did exist, it was harmless.

Barnes has not established either deficient performance or the resulting prejudice required to prevail on a claim of ineffective assistance of counsel.  For the same reasons, Barnes's constitutional rights to due process and a fair trial were not violated because the jury received CALCRIM No. 332.

## DISPOSITION

The judgment is affirmed.


HARRELL, J.

WE CONCUR:


PEÑA, Acting P. J.


DESANTOS, J.